UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Essie Peschong,<br>D.P., a minor, by and through his parent and<br>    natural guardian, Essie Peschong,<br>E.P.P., a minor, by and through his parent and<br>    natural guardian, Essie Peschong, and<br>E.C.P., a minor, by and through her parent and<br>    natural guardian, Essie Peschong,<br><br>        Plaintiffs,<br><br>  vs.<br><br>Children's Healthcare d/b/a Children's Hospitals<br>    and Clinics of Minnesota, and<br>Alice Swenson, M.D.,<br><br>        Defendants. | Civil File No. 17-cv-00706-DSD-KMM<br><br>**AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Essie Peschong, D.P., E.P.P, and E.C.P., for their cause of action against Defendants Children's Healthcare d/b/a Children's Hospitals and Clinics of Minnesota and Alice Swenson, M.D., hereby state and allege as follows:

**PARTIES**

1. At all times relevant, Plaintiffs Essie Peschong, D.P., E.P.P., and E.C.P. were residents of Hennepin County, Minnesota. Ms. Peschong is mother to D.P., E.P.P., and E.C.P. At all times relevant, none of D.P., E.P.P., and E.C.P. had yet reached the age of majority.

2. Defendant Children's Healthcare d/b/a Children's Hospitals and Clinics of Minnesota ("Children's") is a non-profit corporation organized under the laws of Minnesota, with a principal place of business at 2545 Chicago Avenue South, Minneapolis, Minnesota 55404.

1

3. Defendant Alice Swenson, M.D., is a child abuse pediatrician at Children's Midwest Resource Center, located in St. Paul, Minnesota. Children's Midwest Resource Center is owned and operated by Defendant Children's. At all times relevant Defendant Swenson has been an employee, agent, and/or servant of Defendant Children's.

**JURISDICTION & VENUE**

4. This action arises under the Fourth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1343(a)(4). Plaintiffs further invoke this Court's supplemental jurisdiction to consider claims under state law.

5. This Court has personal jurisdiction over Defendants because Defendants reside in and conduct business within the District of Minnesota.

6. Venue is proper in this judicial district in accordance with 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in, and the events giving rise to Plaintiffs' claims occurred in, the District of Minnesota.

**FACTS**

A. *D.P.'s (Abbreviated) Medical History*

7. Ms. Peschong gave birth to D.P. in 2004, following a medically-complicated pregnancy during which ultrasounds indicated possible physical birth defects.

8. D.P. was born with dysmorphic features. His medical providers soon ordered numerous tests revealing, among other things, a bone disorder and obstructions within D.P.'s upper airway.

9. D.P. received his primary medical care from physicians at Defendant Children's from 2004 through 2007. During that time, D.P.'s physicians assessed and/or diagnosed various conditions.

10. Before he turned one year old, many specialists treated D.P. and performed tests and numerous invasive procedures on him. Even as an infant, medical providers regularly remarked in their records that D.P. had "a complex medical history."

11. By the time D.P. turned eleven years old in 2015, he had: spent forty-one days of his life hospitalized due to breathing difficulties; been treated in the emergency room nine times with reactive airway disease and/or pneumonia; undergone two adenoidectomies, a tonsillectomy, a turbinectomy, numerous laryngoscopies and bronchoscopies, and a half-dozen sleep studies.

12. Among other medical conditions, D.P. suffered from persistent respiratory ailments and diseases, and obstructive sleep apnea. His medical providers attempted various treatments including supplemental oxygen, positive airway pressure devices during sleep, and multiple of the above-mentioned surgeries.

13. As D.P. grew into a toddler and learned to walk, he often suffered from fatigue. His medical providers prescribed a "stroller"-type wheelchair so he could maintain mobility.

14. Near the end of 2007, D.P.'s primary medical care was transferred to Gillette Children's ("Gillette"). Following the transfer of D.P.'s primary medical care to Gillette, he continued to receive care and treatment from providers at Defendant Children's.

15. D.P.'s medical conditions severely and negatively affected his behavior and school performance as he grew older. One of those conditions was D.P.'s obstructive sleep apnea,

which made it difficult to him to sleep, and made him sleep poorly when he did, causing D.P. to suffer persistent tiredness and fatigue.

16. Positive airway pressure devices offered D.P. some relief from his obstructive sleep apnea and upper airway obstructions, but they were insufficient to alleviate his symptoms and he had difficulty tolerating them over time.

17. When D.P. was approximately eight years old, he and Ms. Peschong began a series of meetings and examinations with specialists in pediatric sleep medicine, craniofacial surgery, and pediatric otolaryngology ("ENT"). After nearly two years of consideration, more than two dozen consultations and myriad tests including multiple sleep studies and surgeries, D.P.'s medical providers recommended he undergo either a LeFort III procedure or a tracheostomy.

18. Ms. Peschong and D.P. feared the extremely invasive nature of the LeFort III procedure. They opted for the doctors' tracheostomy recommendation. On July 1, 2014, Dr. Richard Karlen, a board-certified pediatric ENT, performed tracheostomy surgery on D.P.

19. The surgery was successful. With the tracheostomy, D.P. felt immediate relief from his obstructive sleep apnea. He could sleep.

20. D.P.'s use of supplemental oxygen and a wheelchair decreased prior to the tracheostomy surgery. Afterward, he rarely used either of those prescribed treatments.

21. After the tracheostomy surgery, D.P.'s behavior, school performance, and social skills improved dramatically.

      B. *Defendant Swenson's Report of Medical Child Abuse*

22. Cindy Brady, a nurse at Defendant Children's, had been involved in D.P.'s care and treatment earlier in his life. For example, Brady issued a Certificate of Medical Necessity

for D.P. in 2008, which stated he required a lifetime prescription for supplemental oxygen due to his respiratory ailments.

23. On information and belief, Brady last provided medical care to D.P. in 2008.

24. On or about February 2015, Brady contacted Defendant Swenson, a child abuse pediatrician at Defendant Children's. On information and belief, Brady told Defendant Swenson that she:

   a. Believed D.P. continued to use supplemental oxygen;

   b. Believed D.P. had recently undergone, or was about to undergo, tracheostomy surgery; and

   c. Was concerned that D.P. had been put on supplemental oxygen for a long period of time without a clear need for it, and that a tracheostomy was unnecessary.

25. On information and belief, Brady had no first-hand knowledge regarding her statements to Defendant Swenson.

26. On information and belief, Defendant Swenson knew or believed that Brady was not a reliable source of information regarding D.P.'s medical care.

27. On information and belief, Brady asked Defendant Swenson to review D.P.'s medical records on concern of medical child abuse.

28. Four months later, in June 2015, Defendant Swenson wrote a report purporting to summarize D.P.'s medical records and concluding in part that Ms. Peschong "appears to be misrepresenting [D.P.'s] medical conditions in order to obtain care that [D.P.] does not need and that may, in fact, be harmful" (the "Report").

29. To prepare the Report, Defendant Swenson purportedly reviewed "thousands of pages" of D.P.'s medical records. Defendant Swenson stated in the Report that this review took her six hours.

30. By way of comparison, it took D.P.'s current pediatrician "two weeks of reading and sorting through the information to have any sense of what all had occurred in his life medically."

31. When she made the Report, Defendant Swenson was aware that she did not possess a substantial number of D.P.'s medical records at Gillette, including the medical records relating to his tracheostomy.

32. To prepare the Report, Defendant Swenson purportedly e-mailed Dr. Paula Mackey, who had been D.P.'s primary care physician at Children's until 2007.

33. On information and belief, Dr. Mackey last provided medical care for D.P. in 2007.

34. In preparing the Report, Defendant Swenson did not contact any other person who had provided medical care to D.P., including any person who had treated D.P. during the previous seven years.

35. In preparing the Report, Defendant Swenson did not contact Ms. Peschong, or any person who knows D.P. Defendant Swenson did not contact, meet, or examine D.P.

36. In the Report, Defendant Swenson employed exaggerated language and made inaccurate and/or misleading statements about D.P.'s medical records.

37. In the Report, Defendant Swenson made numerous false statements about D.P.'s medical records and medical history, including:

a. That doctors diagnosed D.P. with failure to thrive based on Ms. Peschong's reports, when the diagnosis was based on D.P.'s weight being in the third percentile and doctors' own observations of his difficulty feeding.

b. That a medical exam showed D.P. had no respiratory anomalies, when the exam showed forty-two oxygen desaturations and D.P.'s doctor characterized it as "abnormal."

c. That no oxygen desaturations "were ever witnessed when [D.P.] was an inpatient," when providers noted and recorded D.P.'s oxygen desaturations in dozens of his medical records.

d. That none of D.P.'s sleep studies had shown severe obstructive sleep apnea, when that condition was seen multiple times, including in his earliest sleep studies as an infant.

e. That D.P.'s medical providers "repeatedly" noted he had no need for supplemental oxygen, when no medical record said that.

f. That D.P.'s medical providers "express[ed] skepticism about [his] diagnoses and medical needs," when no medical record stated such a concern.

38. In the Report, Defendant Swenson stated, "[D.P.] has been tethered to external oxygen for his entire life." This was false, and it was a statement Defendant Swenson could not have reasonably or responsibly made when she possessed only the medical records from the first half of D.P.'s life.

39. In the Report, Defendant Swenson stated, "Evaluation of [D.P.'s] medical records indicates a clear long-standing pattern of [Ms. Peschong] reporting symptoms that are not observed by the medical staff," and that Ms. Peschong's "misrepresentations" had resulted in her son

7

undergoing numerous invasive and harmful medical treatments. This was false. Defendant Swenson has conceded that she cannot identify a single instance of Ms. Peschong making a misrepresentation to D.P.'s medical providers.

40. In the Report, Defendant Swenson falsely stated that D.P. was the victim of medical child abuse perpetrated by Ms. Peschong.

41. None of D.P.'s medical records at the time of the Report described any concern from a care provider that Ms. Peschong sought unnecessary medical treatments for her son.

42. Even if Defendant Swenson had accurately described D.P.'s medical records, which she did not, she could not reasonably or responsibly have diagnosed current medical child abuse based on years-old documents.

### C. *The Report's Submission and D.P.'s Removal*

43. On or about June 22, 2015, Defendant Swenson submitted the Report to Hennepin County Child Protective Services ("HCCPS"), a government agency.

44. The Report was a "report" as that term is defined by Minn. Stat. § 626.5556, subd. 2(m).

45. The Report was false.

46. On information and belief, Defendant Swenson knew the Report was false or, alternatively, made the Report recklessly and without regard to whether it was true.

47. The Report recommended that D.P. be removed from his home, and that all "medical interventions," including D.P.'s tracheostomy, "be removed as quickly as possible."

48. On or about June 29, 2015, HCCPS presented an ex parte child protection petition to Hennepin County Juvenile Court claiming D.P. was a victim of medical child abuse and identifying Ms. Peschong as the perpetrator of the abuse (the "Petition").

49. Most of the Petition's factual allegations were taken verbatim from the Report.

50. HCCPS is required under Minn. R. Juv. Prot. P. 16.02 to perform a reasonable inquiry into a child protection petition's factual allegations before presenting it to a court.

51. HCCPS did not perform an inquiry into the Report's factual allegations.

52. HCCPS relied on "the findings and report of Dr. Alice Swenson of the Midwest Children's Resource Center," based on its belief that she was "an expert in her field."

53. On information and belief, Defendant Swenson knew or should have known that HCCPS would rely on her Report and not investigate its factual underpinnings, based on her previous experience working with HCCPS and other child-protection agencies as a child abuse reporter.

54. HCCPS, with Defendant Swenson as a willful, joint participant, fulfilled its statutory duty to perform a reasonable inquiry into the Petition's factual allegations by clothing Defendant Swenson with the authority to perform the inquiry.

55. Defendant Swenson's inquiry into the factual allegations set forth in the Petition was not reasonable. Any reasonable inquiry into the factual allegations set forth in the Petition would have shown that many of them were false.

56. On information and belief, Defendant Swenson and HCCPS had a mutual understanding that HCCPS would rely upon and enforce Defendant Swenson's reports of medical child abuse, including the Report.

57. On information and belief, Defendant Swenson and HCCPS had a mutual understanding that HCCPS would rely upon and enforce Defendant Swenson's inquiry into the Petition's factual allegations.

58. On information and belief, HCCPS, through its previous conduct and its contacts with Defendant Swenson in this case, so significantly and overtly encouraged Defendant

Swenson's conduct in submitting the Report as to make the submission an action of HCCPS.

59. On information and belief, HCCPS, through its previous conduct and its contacts with Defendant Swenson in this case, so significantly and overtly encouraged Defendant Swenson's conduct in inquiring into the Petition's factual allegations as to make the inquiry an action of HCCPS.

60. Defendant Swenson was a willful participant in joint activity with HCCPS in denying the Plaintiffs' constitutional rights.

61. The Hennepin County Juvenile Court granted the ex parte petition. If the false, reckless, and/or misleading factual allegations had been removed from the Petition prior to its submission to the Hennepin County Juvenile Court, and only true information were presented in the Petition, then the ex parte order would not have been granted and D.P. would have not been removed from his home.

### D. *The Consequences of Defendant Swenson's Report*

62. Prior to July 8, 2015, Ms. Peschong and her three children lived together in the family's home. Ms. Peschong had physical and legal custody of D.P. from the time he was born through July 8, 2015.

63. On July 8, 2015, HCCPS took custody of D.P. and removed him from his home and his family.

64. HCCPS brought D.P. to Defendant Children's, where he was forced to stay as an inpatient for more than a week. Defendant Children's prevented Ms. Peschong from seeing, communicating with, or otherwise contacting D.P. after he was admitted inpatient.

65. Without D.P.'s or Ms. Peschong's consent, doctors at Defendant Children's downsized D.P.'s tracheostomy tube.

66. On information and belief, doctors at Defendant Children's intended to remove D.P.'s tracheostomy until they spoke with Dr. Karlen and then chose to keep it in place.

67. D.P. feared for his safety while he was admitted to Defendant Children's in July 2015.

68. After he left the hospital in July 2015, D.P. was placed in foster care. D.P. did not return home to his mother, brother, and sister for seven months.

69. Because of Defendant Swenson's Report, Ms. Peschong, D.P., E.P.P., and E.C.P. each suffered the breakup of their family, and have each experienced severe emotional distress, including but not limited to mental anguish, fear, humiliation, depression, and terror. Ms. Peschong, D.P., E.P.P., and E.C.P. have each experienced physical manifestations of their emotional distress.

70. Because of Defendant Swenson's Report, D.P. has suffered physical harm, pain and suffering, reputational harm, the loss of liberty, and the loss of his mother's care and guidance.

71. Because of Defendant Swenson's Report, Ms. Peschong has suffered the loss of custody of her child, lost earnings, severe harm to her reputation, and medical, legal, and counseling costs.

72. Because of Defendant Swenson's Report, Ms. Peschong, D.P., E.P.P., and E.C.P. will each continue to suffer these extraordinary harms in the future.

73. On information and belief, Defendant Swenson knew her Report was false, and that it would create a high risk of harm to Ms. Peschong and her children, yet she proceeded to make the Report with malicious intent, or with indifference to such knowledge.

## COUNT I: VIOLATION OF MINN. STAT. § 626.556, SUBD. 5

*Essie Peschong vs. Defendants Swenson and Children's*

74. Plaintiffs restate and re-allege the foregoing paragraphs as set forth here in full.

75. On or about June 22, 2015, Defendant Swenson made a "report," within the meaning of Minn. Stat. §626.556, subd. 2(m), to HCCPS regarding Essie Peschong.

76. Defendant Swenson made the Report while acting in the scope of her employment with Defendant Children's.

77. The Report was false.

78. Defendant Swenson knew the Report was false. Alternatively, Defendant Swenson made the Report recklessly as to its truth or falsity, knowing it would create a high risk of harm to Ms. Peschong and her children and acting with indifference to that risk.

79. Essie Peschong has suffered, and will continue to suffer, severe damages as a result of the Report.

80. Under Minn. Stat. § 626.556, subd. 5, Defendants are liable to Essie Peschong for her actual damages, punitive damages as set by the judge or jury, and costs and reasonable attorneys' fees.

## COUNT II: VIOLATION OF 42 U.S.C. § 1983 (ILLEGAL SEIZURE)

*D.P. vs. Defendant Swenson*

81. Plaintiffs restate and re-allege the foregoing paragraphs as though set forth here in full.

82. The Fourth Amendment to the United States Constitution guarantees the right to be secure in one's person, and prohibits a person's unreasonable seizure under color of law.

83. Defendant Swenson's Report recommended D.P.'s seizure.

84. Defendant Swenson made the Report under color of law.

85. The Report's factual allegations were false.

86. HCCPS clothed Defendant Swenson with the authority to perform the inquiry that HCCPS was required to perform prior to the filing of a child protection action under Minn. R. Juv. Prot. P. 16.02.

87. Defendant Swenson inquired into the Petition's factual allegations under color of law.

88. Defendant Swenson did not perform a reasonable inquiry into whether the facts alleged in the Petition were true, and did not hold a reasonable suspicion that D.P. was the victim of medical child abuse.

89. In reliance on the Report and Defendant Swenson's performance of its required inquiry into the underlying factual allegations, HCCPS seized D.P.

90. D.P.'s seizure was not reasonable.

91. Defendant Swenson's failure to perform a reasonable inquiry into the factual allegations set forth in the Petition caused D.P. to be deprived of his rights secured by the Fourth Amendment to the United States Constitution.

92. D.P. has suffered, and will continue to suffer, severe harm as a result of the Report.

93. D.P. has suffered, and will continue to suffer, severe harm as a result of Defendant Swenson's failure to perform a reasonable inquiry into the Petition's factual allegations.

### COUNT III: VIOLATION OF 42 U.S.C. § 1983 (RIGHT TO FAMILY INTEGRITY)

*Essie Peschong, D.P., E.P.P., and E.C.P. vs. Defendants Swenson and Children's*

94. Plaintiffs restate and re-allege the foregoing paragraphs as though set forth here in full.

95. The United States Constitution guarantees family members a liberty interest in each other's care and companionship.

96. The Report recommended D.P.'s seizure.

97. Defendant Swenson submitted the Report under color of law.

98. HCCPS clothed Defendant Swenson with the authority to perform the inquiry HCCPS was required to perform prior to the filing of a child protection action under Minn. R. Juv. Prot. P. 16.02.

99. Defendant Swenson inquired into the Petition's factual allegations under color of law.

100. Defendant Swenson did not perform a reasonable inquiry into whether the facts alleged in the Petition were true, and did not hold a reasonable suspicion that D.P. was the victim of medical child abuse.

101. Defendant Swenson knew or should have known that submitting the Report would directly affect the constitutionally-protected relationships between each member of Ms. Peschong's family.

102. Defendant Swenson knew or should have known that failing to properly investigate the factual allegations in the Petition would directly affect the constitutionally-protected relationships between each member of Ms. Peschong's family.

103. Defendant Swenson's submission of the Report and her failure to properly investigate the Petition's factual allegations did directly interfere with the constitutionally-protected relationships between each member of Ms. Peschong's family.

104. Essie Peschong, D.P., E.P.P., and E.C.P. have suffered, and will continue to suffer, severe harm because of the Report.

105. Essie Peschong, D.P., E.P.P., and E.C.P. have suffered, and will continue to suffer, severe harm because of Defendant Swenson's failure to perform a reasonable inquiry into the Petition's factual allegations.

106. Defendant Children's, acting under color of law, wrongfully interfered with Ms. Peschong's and D.P.'s respective rights to enjoy each other's care and companionship when Defendant Children's prevented Ms. Peschong from seeing, communicating with, or otherwise contacting D.P. after he was admitted inpatient.

107. Essie Peschong and D.P. suffered severe harm because of Defendant Children's conduct.

### COUNT IV: DEFAMATION AND DEFAMATION PER SE

*Essie Peschong and D.P. vs. Defendants Swenson and Children's*

108. Plaintiffs restate and re-allege the foregoing paragraphs as though set forth here in full.

109. Defendant Swenson made the Report while acting in the scope of her employment with Children's.

110. The Report communicated multiple false statements, including that Ms. Peschong misrepresented D.P.'s symptoms and diagnoses to medical providers, and that she thereby caused harm to D.P.

111. Defendant Swenson communicated the Report to HCCPS.

112. On multiple occasions, while acting in the scope of her employment with Defendant Children's, Defendant Swenson communicated to medical professionals who were involved in D.P.'s treatment: false descriptions of D.P.'s medical records, that D.P. was a victim of Munchausen by Proxy, and that Ms. Peschong misrepresented D.P.'s symptoms and diagnoses and thereby caused him harm.

113. Defendant Swenson did not act in good faith when she communicated any of the above-referenced statements.

114. The false statements were of the type that would tend to harm Ms. Peschong's reputation and lower her in the estimation of the community.

115. The false statements were of the type that would tend to harm D.P.'s reputation and lower him in the estimation of the community.

116. The false statements affected Ms. Peschong in her profession as a nurse.

117. Ms. Peschong has suffered, and will continue to suffer, severe damages as a result of the Report.

118. The false statements diminished D.P.'s ability to receive medical treatment, and will continue to do so.

## COUNT V: FALSE IMPRISONMENT

*D.P. vs. Defendants Swenson and Children's*

119. Plaintiffs restate and re-allege the foregoing paragraphs as though set forth here in full.

120. Defendant Swenson made the Report while acting in the scope of her employment with Children's.

121. In her Report, Defendant Swenson stated that it was "extremely important that the child be placed in a safe environment," and that she made the Report to HCCPS, "[f]or this reason . . . in hopes that [D.P.] may be placed in a safe environment."

122. Defendant Swenson intended that the words of her Report result in the restriction of D.P.'s physical liberty.

123. D.P. actually was confined as a result of the Report, without reasonable means of escape.

124. D.P. was aware of his confinement.

125. D.P. suffered substantial damages as a result of the confinement.

## COUNT VI: INTRUSION UPON SECLUSION

*Essie Peschong, D.P., E.P.P., and E.C.P. vs. Defendants Swenson and Children's*

126. Plaintiffs restate and re-allege the foregoing paragraphs as though set forth here in full.

127. In making her Report, Defendant Swenson intentionally interfered with Essie Peschong's, D.P.'s, E.P.P.'s, and E.C.P.'s solitude and private affairs.

128. Essie Peschong, D.P., E.P.P., and E.C.P. each had a reasonable expectation of privacy in their solitude and in their private affairs.

129. Defendant Swenson's intrusion upon Essie Peschong's, D.P.'s, E.P.P.'s, and E.C.P.'s privacy occurred in a way that would be highly offensive to a reasonable person in their position.

130. Because of Defendant Swenson's invasion of privacy, Essie Peschong, D.P., E.P.P., and E.C.P. have suffered, and will continue to suffer, severe harm.

### COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Essie Peschong, D.P., E.P.P., and E.C.P. vs. Defendants Swenson and Children's*

131. Plaintiffs restate and re-allege the foregoing paragraphs as though set forth here in full.

132. Defendant Swenson made the Report while acting in the scope of her employment with Children's.

133. Defendant Swenson's submission of the false Report to HCCPS was extreme and outrageous conduct, beyond the bounds of decency and tolerability in a civilized community.

134. Defendant Swenson submitted the Report intentionally.

135. Alternatively, Defendant Swenson submitted the Report recklessly as to its truth or falsity.

136. Defendant Swenson's submission of the false Report caused Essie Peschong, D.P., E.P.P., and E.C.P. to suffer emotional stress so severe that no reasonable person could be expected to endure it.

### COUNT VIII: NEGLIGENT SUPERVISION

*D.P. vs. Defendant Children's*

137. Plaintiffs restate and re-allege the foregoing paragraphs as though set forth here in full.

138. On information and belief, Defendant Swenson's submission of a false report of medical child abuse was foreseeable to Defendant Children's.

139. On information and belief, Defendant Children's, as Defendant Swenson's employer, failed to exercise reasonable care in supervising Defendant Swenson.

140. The Report caused a reasonable apprehension of physical injury to D.P.

141. The Report in fact caused physical injury to D.P.

142. The physical and extreme emotional harm to D.P. was foreseeable to Defendant Children's.

WHEREFORE, Plaintiffs Essie Peschong, D.P., E.P.P., and E.C.P. pray for judgment against Defendants Children's Healthcare d/b/a Children's Hospitals and Clinics of Minnesota and Alice Swenson, M.D., jointly and severally, in an amount in excess of $50,000.00, and for all other damages and remedies available to Plaintiffs, including attorneys' fees, costs, disbursements, and interest as allowed by applicable law and as the Court deems just and equitable. Plaintiffs will seek leave to make a motion to amend this Complaint to assert a claim for punitive damages pursuant to Minn. Stat. §§ 549.191, 549.20, and 626.556, subd. 5.

**TARSHISH CODY, PLC**

Dated: March 7, 2017

_/s/ Scott Cody_
Scott Cody (#392137)
Kyle S. Kosieracki (#396564)
6337 Penn Avenue South
Richfield, MN 55423
Tel: (952) 361-5556
Fax: (952) 361-5559
scody@attorneysinmn.com
kkos@attorneysinmn.com
**ATTORNEYS FOR PLAINTIFFS**